Battle, J.
The petitioner was, prior to the 26th day of April, 1864, a Lieutenant in the army of the Confederate States ;*but by an order of that date, he was dropped from the roll as an officer. At the August Term, 1864, of the Court of JPleas and Quarter sessions for the county of Hyde, he was elected Register of the county, and was dmy qualified as such by entering.into bond and’.taking the necessary oaths. Subsequently, to wit: on the 22d of September, 1864, he was ordered as a conscript, by the enrolling officer of the county, to report himself without delay to the camp of instruction,* near Raleigh. The date of enrollment is not distinctly specified either in the petition or return, though it is strongly to be inferred from the allegations of the petitioner, that it was prior to his election as Register. That, however,T consider as immaterial,, because 1 think that- under the army regulations he was in the military service as a private, as soon as' he v?as dropped from the roll as an officer. See Army Regulations.
It is agreed by thé counsel that a Register of a county is a civil officer of the State ; and that the Governor had claimed the petitioner as an exempt from military service in the army of the Confederate States.
Upen this statement óf facts, it is contended by the-counsel for the petitioner^ first, that"he is entitled to a discharge from custody upon a just construction of .the second paragraph of the .10th section of the act of Congress, ratified on the 17th day of February, 1864, though he .was in the military service when he was elected Register of Hyde county. .Secondly, if. that be not so, that after his •election and qualification as a civil officer of the State, he became exempt from any further service in the army.of the Confederate States, because Congress has no power to *114 restrict the Statg in the selection of any of its citizens, whether in-or'out of the army, to fill any office necessary to the action of the government. I differ from the counsel as to the correctness of his position, and will proceed; to 3tate, as well as I can, the reasons upon which my opinion is founded:
1st.' In ascertaining and settling the construction of the 'military act of February, 1864, it is proper to avail our-, selves of any light which may be thrown upon the subject by any statute, in pari materia, particularly if it were passed about the same time. 1 Black. Com., 60.
It appears from the act of Congress, approved the 5th day of January, 1864, on titled “ an act to put an end to the exemption from military service of those wlio have heretofore furnished'substitutes,” that the country was then in very great need of soldiers. ’ The preamble recites that — ‘( Whereas, in the present circumstances of the country, it requires the aid of all who are able to bear arms, the Congress of the-Confederate States do enact,” &c. This most pressing want of th*e Confederate goverri-meut is,- if possible, still more strongly shown in the act •under consideration. It repeals all former laws which granted exemptions, and thus., at once sweeps away the long list of exempts which may be found in i;he act of October, 1862. It enlarges the ages of conscripts from 18 and 45 to 1Y and 50, thus calling into the field of active service boys and old men. It takes from their homes almost every person capable of bearing arms, except those officers who are necessary to the proper administration of the Confederate and State governments, and a few others who were deemed necessary to carry on the educational, ■industrial and other indispensable pursuits of the country, with the addition of a-still fewer number who are re *115 strained from bearing arms by religious scruples. . With this most, urgent, pressing demand for soldiers for tlx; de-fence oft.be country in its.life and death struggle for national existence, placed thus prominently before us, hare wc a right to infer that. Congress intended, by the exemptions which it granted in the act of February, 1804, to release from further service in the army any soldier whom it had a right to retain there 2 It seems to me to bo ignoring the whole, spirit of the act to suppose so. I cannot come to any such conclusion, -unless 1 find it so declared by the express terms of the. act!
So far from finding .any express declaration in the act to that .effect, the terms of exemption may be fully satisfied by confining tliem to the persons filling offices, occupying positions. or engaged fin pursuits, at the time of their enrolment. In some .cases the persons exempted must have been employed in the duties -of their offiee or .profession, at the date of the act, and could not entitle themselves to an exemption by subsequently engaging in such office.qr profession, even prior to the time of their enrolment. This is the case with regard to ministers' of religion; physicians and school-masters.' '
All the farmers of the cóuntry are put into the army except the bonded overseers of fifteen able-bodied field hands, and even they, it seems, might have been deprived of the benefit*of this .’exemption had they been enrolled since the 1st of February, 1864, but for a special provision in their favor. See 4th par. of the 10th sec. of the act of February, 1864. Looking, then, over the whole act, from the first section to the last, I am unable to discover anv-thing, either in its language or -spirit, which releases or exempts from service any person already in the army as a Boldier. The fact that, by another act of Congress, ofifi- *116 ,cers and soldiers in the army may become exempt from further service by being elected to eertain offices or places of trust, either in the State or Confederate government, does not affect the present ease, which • depends, in the view in which I am now looking at it, entirely upon the construction of the act of February, 1864.
2d. The second position taken for the petitioner by hia counsel, is a much more important one, affecting as it docs the relative powers and rights of the Confederate and State governments ; and, I therefore, approach it»' discussion with much diffidence, particularly as I find that the conclusion at which! have arrived, is at variance with the opinion entertained by many of those, for whoso learn-» ing and ability I entertain the highest respect. The difficulties of the case arise from the fact, that the same persons are citizens of two separate and distinct sovereigns, to both of which they owe duty and allegiance. If the constitutions, upon-which tfieir respective governments are based, he rightly construed; and rigidly adhered to, there will be little or no danger of their clashing,- or interfering with each other’in their respective demands of service from the people.- In the distribution’ of the powers of sovereignty, it is conceded that the States have conferred'upon the Confederate' government the war power, that is, the power to declare war, and to raise and support armies. It has been'held bj all the greatest statesmen and judges of the country, that this power is, with a slight exception, unlimited. In aid of this and the other powers, vested in the general government, the Constitution declares, that Congress shall have power “ to make all lavs which shall he necessary and proper ” for carrying them into execution. See Art. 1, sec.. 8, par. 18. And it asserts the supremacy of the Confederate States, *117 as tó tbe powers conferred upon tbe government, by declaring that* “this Constitution, and tbe laws of tbe Confederate States made in pursuance thereof, shall be tbe supreme law of the land ; and tbe Judges in every State shall be bound thereby, anything in tbe ’ Constitution or laws of any State to the contrary, notwithstanding.” Although the war power of the Confederate government is. thus absolute and unlimited in terms, and the supremacy of that government over the States, with regard to that power, is thus clearly and distinctly asserted, it has been decided, and I think rightly decided, that the Confederate government cannot, in the exercise of the war power, destroy the States, by conscribing those officers who are necessary to the action of the State governments. See Burroughs vs. Peyton, decided'by the Supremo Court of Appeals of Virginia, and recognized as authority in Johnson vs. Mallett, decided by tins Court. Whatever persons filled any office in the State, which the Legislature declared to be necessary for the State government, when the act of February 1864-, was passed,wel-e thereby placed beyond the power of conscription by the. Confederate government. That government is founded upon the State governments as sovereigns, and cannot exist without them. The superstructure must fall when its pillars are taken away or destroyed.
But the case is reversed when the' Confederate government lias, in the exercise of its.rightful supreme war power, conscrihed into its service a man who is not an officer of the State, and the State is attempting to take him out of it, by electing him to an office. The man, as a citizen, owed the duty to the general government, which it had called upon him to perform, just, as muchas he owed the-duty to the State, to accept and- discharge the *118 duties, to which he was elected. Here are ¿wo obligation* undoubtedly binding upon the man, but which being inconsistent, cannot both be performed at the same time. How can this conflict be settled, but by resorting to a principle of potent efficacy both in international and municipal law, that priority of possession gives priority of right? This would seem to be a just rule, even if the two governments were equal in their powers with respect to the subject; and it surely cannot operate against that government whose power, in that, particular, is supreme.
The State must, in such a case, yield to the prior daim of the general government, and select some other man to fill its office. The argument that perhaps the State cannot find another person out of the army fit for the place, is answered by the equally probable supposition that the general government may not be able to procure another fit person for a soldier. When either supposition shall become certainty, it will be when both governments are on the eve of destruction.
The petitioner, in the present case, is not one of the officers of the State who is recognized in its Constitution as being essential to the government. If he were so the argument in his favor would be much stronger, perhaps irresistible. The Constitution declares, in express or necessarily implied terms, that there shall be a Governor, Judges of the Supreme Court, Justiocs of the Peace, a Sheriff, a Coroner or Coroners and Constables in each-county; a Secretary of State and several other officers; also members of both houses of the General Assembly; and it may be .that with regárd to all these the State never surrendered the right to have.ihe offices and.places filled by any of her citizens, whether they should be, at the time of their. election, in the service of the general *119 government or not. This is a question of the highest importance to both governments, and I will not undertake to decide upon it until it becomes necessit y, in the performance of my judicial duty, to do so. may also de-’ serve more consideration than Ithe subject has yet received, whether the Legislature can deprive the State oí any of these constitutional officers by permitting them to be conscribed, as it purports to do as to some of them, by the act of December 14th, 1863. See laws of the extra session in Dec., 1863, ch. 14th.
My conclusion, upon a full consideration of the whole matter, is that the judgment which I rendered in vacation, in favor of the petitioner, founded, as I expressed at the time, upon the previous case of Russell vs. Whiting, decided by the Chief' Justice, was erroneous, and ought to be reversed, with costs ; and that the petitioner must be remanded to the custody of Major Peter Mallett, Commandant of Conscripts.
Manly, J., concurred.